IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MELISSA SUE L'HEUREUX, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> MICHAEL J. ASTRUE, ) <br> Commissioner of Social Security. ) <br> ) | Case No. 10-1195-CV-W-ODS |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in February 1981, has earned her GED, and has prior work experience as a deli worker and photographer. She filed her claims for benefits in May 2008, alleging a disability onset date of June 30, 2007, due to a combination of bipolar disorder, degenerative disc disease, and tendinitis. Of these, the first two conditions are alleged to be more significant.

Plaintiff first sought treatment for her back at Truman Medical Center ("TMC") in November 2006; in that visit she also reported experiencing mood swings. She was prescribed Depakote and encouraged to see a psychiatrist or counselor. Lab tests were arranged to determine if there was a rheumatoid cause for her pain. R. at 274. The lab results were negative, so x-rays were ordered; they revealed disc space narrowing at L5-S1 and no other abnormalities. R. at 246, 267, 270. In February 2007, Plaintiff requested an injection for her back but the doctor at TMC declined; instead, she was prescribed Flexeril. Plaintiff also reported she was seeing a psychiatrist, and the doctor

indicated she would have to get medication for her mood swings/bipolar disorder from him.  R. at 269.

Plaintiff's regular doctor was Dr. Christine Moore.  It appears, however, that the first time Plaintiff mentioned her back pain to Dr. Moore was in December 2007.  Dr. Moore indicated Plaintiff suffered from degenerative disc disease and that she was overweight.  R. at 238-39.  Dr. Moore referred Plaintiff to St. Joseph Medical Center where she was prescribed Percocet.  R. at 259.  In April 2008 Plaintiff requested an MRI, which Dr. Moore ordered, R. at 237 – but neither party has indicated where those results can be found in the Record.  In any event, Dr. Moore referred Plaintiff to Dr. Martin Thai at Rockhill Pain Specialists.  Dr. Thai's examination revealed Plaintiff's cervical and thoracic spine were "unremarkable" but there was "pain on extension of the lumbar spine."  Nonetheless, Plaintiff's "[s]trength in her lower extremeities is 5/5 for flexion and extension."

Dr. Thai administered the first in a planned series of steroid injections.  R. at 244-45.  On June 2, Plaintiff told Dr. Thai she had not experienced any relief, so the series of injections was suspended while Dr. Thai obtained a current MRI.  R. at 293.  On June 3, 2008, Dr. Moore completed a questionnaire indicating Plaintiff could lift up to ten pounds, stand up to two hours a day, and could sit without limitation so long as she was able to change positions every thirty to forty-five minutes.  Dr. Moore also opined that Plaintiff could never climb, balance, stoop, kneel, crouch, or crawl.  R. at 242-43.

The MRI requested by Dr. Thai was performed on June 5.  It revealed nothing remarkable with the exception of mild degenerative disc disease and small disc bulges at L4-L5 and L5-S1.  The overall impression was an "[u]nremarkable MRI of the lumbar spine without evidence for central canal or neural foraminal stenosis."  R. at 290-91.  Based on these results, on June 20 Dr. Thai resumed the planned series of epidural injections.  R. at 619.  On July 3, Plaintiff reported that she still experienced no improvement, so Dr. Thai recommended not administering any further injections and that Plaintiff "see a spine surgeon to have a surgical consultation to see if there is any surgical solution to her problem."  R. at 613.

2

Instead of seeing a surgeon, Plaintiff returned to Dr. Moore monthly to receive Percocet. This continued until the following year (July 7, 2009, to be precise), when Plaintiff saw a neurosurgeon, Dr. John Clough. Dr. Clough examined Plaintiff and reviewed her MRI. His examination revealed moderate restrictions of lumbar flexion and mild tenderness in the sacral, coccygeal and pelvic areas, but normal strength and tone. Dr. Clough concluded that standard surgery was inappropriate because there was no nerve-root compression. The only possible surgical responses were disc fusion or disc replacement, neither of which he recommended. R. at 509-10. In September, Dr. Clough ordered another MRI. The findings appear consistent with those of her earlier MRI. R. at 504-05.[1] Meanwhile, Plaintiff continued receiving monthly refills of Percocet from Dr. Moore until at least November 2009.

As noted earlier, the earliest documentation of treatment for bipolar disorder is in November 2006. There are indications she actually sought treatment earlier: on April 28, 2008, Dr. Moore noted Plaintiff had been prescribed Depakote for three years due to mood swings. R. at 237. In any event, there are few treatment records beyond prescription of medication until July 2008, when Plaintiff was referred to Pathways Community Behavioral Healthcare. At her initial appointment Plaintiff reported she had been taking Depakote for four years, but that her mood swings became worse in the last six months (or, eight months after her alleged onset date and two months before she filed for disability benefits). Plaintiff reported that in addition to mood swings and difficulties sleeping and controlling anger, her thoughts raced and she had memory problems. She denied having suicidal thoughts for the past seven to eight years, and the latest of her two suicide attempts was approximately ten years ago. R. at 414-22. Her GAF score was 60. R. at 426.

In July 2008, Plaintiff was also referred to a psychologist (John Keough) for a consultative examination. During the examination, Plaintiff denied having any suicidal thoughts "since she was real young" and "that she likes to go out with friends, go

---

[1] Plaintiff suggests there was a follow-up MRI performed on October 27, 2009. However, the Record indicates this was performed on a different patient. R. at 518.

3

camping and going to nightclubs and dancing." Plaintiff was able to understand and follow simple instructions, move about without exhibiting pain, and "had no difficulty interacting with the consultant, although indications are she was overemphasizing symptomology." Plaintiff was also able to understand and remember instructions that were somewhere between simple and moderate. R. at 431-32. A Psychiatric Review Technique Form was completed by another psychologist (J. Bucklew), indicating Plaintiff had no restrictions in the area of daily living, no episodes of decompensation, and only moderate difficulties maintaining social functioning, concentration, persistence and pace. He endorsed the conclusion that Plaintiff "would have no problem with simple tasks but may have difficulty in a more complex or demanding work setting" and that Plaintiff was "able to perform simple unskilled work with minimal public contact." R. at 437-47.

The next month, Plaintiff began seeing a Nurse Practitioner at Pathways (Elaine Boyd). Between August 2008 and November 2009, Plaintiff saw Nurse Boyd on sixteen occasions for purposes of obtaining medication. Some months Plaintiff reported feeling well. Often, her mood was affected by external stressors (for instance, an eviction notice that was served in July 2009). Plaintiff also often reported improvement in that while she still had mood swings they were less frequent and extreme. By February 2009 Plaintiff was no longer reporting side effects from the medication.

In July 2009, Plaintiff was referred for a psychological evaluation in connection with her application for medical assistance from the Cass County Family Support Division. The evaluation was performed by a psychologist, Holly Chatain. During the evaluation, Plaintiff reported "having a history of 'at least ten' suicide attempts . . . ." Plaintiff's thought processes were unremarkable and her memory appeared intact. Her GAF score was assessed at 45, and Chatain opined that Plaintiff's "psychological functioning is impaired due to depressive and manic phases" and that "[m]onitoring her level of suicidal ideation is warranted due to her reported history of numerous attempts." R. at 512-13.

On November 30, 2009, Dr. Moore completed a Physical Residual and Mental Functional Capacity Questionnaire.  Dr. Moore opined that Plaintiff had moderate restrictions in the activities of daily living and in her ability to maintain concentration, persistence and pace, and marked difficulties maintaining social functioning.  She also declared Plaintiff had three or more episodes of decompensation.  Dr. Moore also opined that Plaintiff lacked the ability to complete a normal workday or workweek without interference from psychological symptoms, regardless of the stress involved.

With regard to Plaintiff's physical capabilities, Dr. Moore indicated Plaintiff

- could walk less than one block without experiencing pain or needing to rest,
- sit for twenty minutes at a time and for two hours per day,
- stand for five minutes at a time and less than two hours per day,
- required the opportunity to shift positions at will,
- needed thirty to forty-five minute breaks every three to four hours to recline, and
- could lift ten to twenty pounds occasionally and less than ten pounds frequently.

Dr. Moore also indicated all of these conditions existed since June 30, 2007.  R. at 520-24.

On December 2, 2009, psychologist Holly Chatain completed a Medical Impairment Questionnaire.  She indicated Plaintiff had continual episodes of decompensation, moderate deficiencies in her ability to maintain concentration, and marked limitations in her ability maintain social functioning and engage in activities of daily living.  She assessed Plaintiff's GAF score at 45.  R. at 652-55.  Nurse Boyd completed a Medical Impairment Questionnaire on December 4, indicating Plaintiff had continual episodes of decompensation, extreme deficiencies in her ability to maintain concentration, persistence, or pace, marked difficulties in maintaining social functioning, and moderate restrictions in daily living activities.  She assessed Plaintiff's GAF score at 51.  R. at 638-41.

During the hearing held in December 2009, Plaintiff testified she had never been hospitalized in connection with her bipolar disorder and denied experiencing side effects from her current medications.  R. at 41.  She also stated she was physically capable of shopping, but needed someone to go with her and calm her down in case she became

5

angry at people she encountered. R. at 46. She is able to do laundry, make her bed, and perform other household chores so long as she has the ability to stop and sit on occasion. R. at 47. She is able to perform most activities of daily living, engage in hobbies (such as photography and using the computer), and attend to her personal grooming needs. R. at 45, 47-49. She "tr[ies] to get out" as much as possible; she gets together with friends twice a week, goes out to eat with her husband or family twice a month, and once a month goes to a local bar with her husband and friends. R. at 51-52. Her daily activities include getting up to help her daughter prepare for school, making breakfast and waking her husband, housework (including cleaning the breakfast dishes), doing laundry, relaxing and watching TV. R. at 52-53.

     Plaintiff's husband was permitted to submit a written statement after the hearing. He stated Plaintiff "change[s] moods without a need for a real catalyst," that he had witnessed her attempting suicide, and that he has had to help her get undressed when her back or wrists hurt. R. at 659. Before the hearing (in June 2008), Plaintiff's husband completed a questionnaire wherein he indicated Plaintiff "cleans house, cooks, takes care of our daughter," feeds and bathes the family's pets, engages in "cleaning, ironing, cooking," and that her condition had no affect on her ability to dress, bathe, or engage in other aspects of personal care. R. at 185-94. Plaintiff also completed a questionnaire sometime before June 2008; she indicated she cooked, cleaned, made the beds, raked leaves, gardened, and drove her daughter to her activities. She listed as hobbies photography, Brownies with her daughter, walking thirty minutes a day, and gardening. She reported no difficulty leaving her house, indicating she left her house at least once per day. Plaintiff denied "any difficulties . . . following written or verbal instructions" or having any memory problems. R. at 207-14.

     The ALJ found Plaintiff's testimony was not entirely credible. Her testimony about the effects of bipolar disorder was rejected because it was inconsistent with her prior statements, both those made to people treating her and those made at earlier points in the administrative process. The ALJ found Plaintiff suffered from mild restrictions in the activities of daily living, moderate restrictions in the areas of social functioning, concentration, persistence, and pace, and no episodes of decompensation.

6

The ALJ noted and discounted the contrary opinions from Nurse Boyd and Dr. Chatain because there was no evidence of episodes of decompensation and other inconsistencies in the Record.  The ALJ recognized Mr. Keough was not an acceptable medical source, but nonetheless accorded his opinion "great weight" because it was supported by the Record (including Plaintiff's own statements).  Great weight was also accorded to Dr. Bucklew's report.

However, the ALJ found that "[r]egarding her back impairment, the claimant is partially credible."  The ALJ accorded "great weight" to Dr. Moore's June 2008 assessment, but "little weight" to her November 2009 assessment because it was "unsupported by treatment records and seemingly based on claimant's subjective complaints.  Furthermore, it is inconsistent with the claimant's mild degenerative changes and mild neural foraminal narrowing."  R. at 10-15.

Based on Plaintiff's credible testimony and Dr. Moore's June 2008 assessment, the ALJ found Plaintiff could perform sedentary work except that she could occasionally climb ramps or stairs, never climb ladders, only occasionally stoop, crouch, kneel, and crawl, and needed to avoid certain environmental conditions (sch as heat, cold and humidity).  Plaintiff required the freedom to alternate between standing, sitting and walking every thirty minutes, with such position shifts not affecting her ability to continue her duties.  "Furthermore, she is limited to tasks that can be learned in 30 days or less, involving no more than simple work related decisions, and few work place changes.  In addition, the claimant can have no more than occasional interaction with the public, coworkers, and supervisors.  R. at 11.  Plaintiff's prior work was performed above the sedentary level, so Plaintiff was unable to return to her past relevant work.  Relying on testimony from a vocational expert, the ALJ found Plaintiff could perform sedentary work such as administrative support worker, electronics bonder, and optical goods assembler.  R. at 16.

7

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010). However, if it is possible to draw two different conclusions – one of which is the Commissioner's – the Court must affirm even if it would have reached a different conclusion. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

Plaintiff's arguments are interrelated, and are best addressed collectively. She first contends the ALJ erred in relying on consultative examinations instead of deferring to Dr. Moore's second opinion and the opinions provided by Nurse Boyd and Doctor Chatain. The second argument contends the ALJ erred in her analysis of Plaintiff's credibility.

Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted). Starting with Dr. Chatain, the Court notes that while Plaintiff consistently refers to Dr. Chatain as her therapist, there is nothing in the Record to substantiate such a

relationship exists.  There are no notes, records or other indications Dr. Chatain saw Plaintiff on any occasion other than as a consultant on behalf of Cass County Family Support Division.  In any event, the absence of supporting documentation justifies the ALJ's decision not to accord her July 2009 opinion much weight.  Moreover, Dr. Chatain's report indicates its conclusions are premised, at least in part, on Plaintiff's alleged suicide attempts.  This is significant because, as the ALJ found, Plaintiff consistently denied attempting suicide in the last ten years.  The conclusions are premised on faulty/incorrect data, making them unreliable.

Nurse Boyd is not a medical source to whom deference is owed; she is an "other source" that may be considered to help ascertain the severity of a claimant's impairments and the effects therefrom.  E.g., 20 C.F.R. § 404.1413(a), (d).  Nurse Boyd's observations were inconsistent with the Record in many respects, particularly when her observations were compared to (1) Plaintiff's statements to Nurse Boyd and (2) Plaintiff's statements during the administrative process.

It is not clear that Dr. Moore was Plaintiff's treating physician with respect to Plaintiff's bipolar disorder.  While Dr. Moore was Plaintiff's regular doctor, it seems inappropriate to defer to her opinions with respect to a condition that she was not treating and for which she had specifically referred Plaintiff to a different caregiver.  In any event, Dr. Moore's opinions were also not supported by Plaintiff's statements and, in some instances, were inconsistent.

With regard to Plaintiff's back, the ALJ deferred to Dr. Moore's initial opinions – but did not defer to her later, more restrictive, opinions.  Critically, nothing in the Record demonstrates Plaintiff's condition changed between June 2008 and July 2009, and there is no basis for crediting Dr. Moore's changed opinion.  Curiously, Dr. Moore's July 2009 opinion indicates it describes Plaintiff's condition since Plaintiff's alleged onset date – without even acknowledging Dr. Moore's contradictory opinion from June 2008.  The later opinion is also inconsistent with the medical evidence, the opinions of specialists to whom Dr. Moore referred Plaintiff, and Plaintiff's own reports about her activities.

9

This brings us to Plaintiff's testimony. The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

The ALJ considered the Record fully.  Plaintiff gave conflicting statements regarding her daily activities.  She gave conflicting statements regarding the effects of her bipolar disorder.  She gave conflicting statements regarding the existence and extent of side effects and efficacy of her medication.  Given these conflicting statements, the Court cannot hold the ALJ erred in opting to believe some statements and not others.  The ALJ also appropriately considered the medical evidence, which did not substantiate a medical condition that could be expected to cause the degree of pain Plaintiff reported.  Finally, the ALJ's assessment of Plaintiff's residual functional capacity is consistent with most of Plaintiff's statements and the other evidence in the Record, and cannot be set aside simply because it conflicts with other evidence in the Record.

## III.  CONCLUSION

The ALJ's factual findings – including her assessment of Plaintiff's credibility and Plaintiff's residual functional capacity – are supported by substantial evidence in the Record as whole.  The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                                      /s/ Ortrie D. Smith
                                                      ORTRIE D. SMITH, SENIOR JUDGE
DATE: July 27, 2011                                   UNITED STATES DISTRICT COURT